### NASIF
### v.
### LAWRENCE WAREHOUSE CO.
### Civ. A. No. 1778.

United States District Court
S. D. Mississippi, Jackson Division.
June 29, 1954.

Rufus Creekmore, of Creekmore & Beacham, Jackson, Miss., P. Z. Jones, of Barnett, Jones & Montgomery, Jackson, Miss., for plaintiff.

Harold Cox, Jackson, Miss., Charles O. Butler, Chicago, Ill., for defendant.

THOMAS, District Judge.

This action arises out of the failure of the defendant, Lawrence Warehouse Company, to deliver goods alleged to have been stored in its warehouse located at Jackson, Mississippi, on the premises of General Wholesale Company, hereinafter referred to as General. Both actual and punitive damages are claimed. The actual damages sought consist of four claims:

1. The alleged shortage of goods under a warehouse receipt which was issued on December 28, 1951, at which time both the warehouse manager and the plaintiff knew a portion of the goods shown thereon were not in the warehouse.

2. The alleged shortage of goods under warehouse receipts which plaintiff purchased from the Deposit Guaranty Bank & Trust Company.

3. The alleged shortage of goods which was not, but allegedly should have been, placed under warehouse receipt.

4. The alleged errors in collection by the warehouse manager for goods which were released.

The warehouse in the instant case was what is known as a field warehouse. The defendant herein is engaged in the business of operating field warehouses. The primary service rendered by this type of operation is the placing of goods stored therein under warehouse receipt, the receipts, in turn, being used as collateral for credit purposes. The general storage of goods is incidental to the primary service.

The original agreement between the defendant and General was entered into on May 25, 1948, and provided that the defendant would maintain a warehouse on General's premises. Employees of General who were familiar with General's operation were employed by the defendant. The charge made by the defendant for operating the warehouse was a flat yearly amount plus a specified percentage of the monthly bank borrowing by General, receipts issued by defendant being held by the bank as collateral. In addition thereto, General agreed to reimburse the defendant for all sums expended in the operation of the warehouse.

The lease of the premises (for a nominal amount) was executed by and between General, as lessor, and the defendant, as lessee, on July 1, 1948. This lease provided that General should not have access to the leased premises or to the commodities stored therein, except in certain instances and then only under the supervision of the defendant. Except for amendments not here material, the above agreement and lease were in effect at all times pertinent to the present controversy.

The manager was given written instructions by defendant to issue a receipt upon goods delivered into the warehouse when so requested by the depositor. In the contract involved, the depositor was General. If a receipt was not needed for collateral purposes, the goods could be placed in the warehouse and withdrawn at General's request. At all times during the operation of the warehouse there were unreceipted goods stored therein.

Originally, the warehouse receipts were held as security by the Deposit Guaranty Bank & Trust Company of Jackson, Mississippi. While the bank was the receipt holder, it submitted monthly to the defendant the amount of General's borrowing for which the receipts were held as security. In 1951, these receipts on goods valued in excess of $50,000, securing an indebtedness to the Bank of approximately $26,000, were purchased from the Bank by the plaintiff for some $14,000. The reason for such liberal dealing on the part of the Bank does not appear upon the face of the record, but at the time of the purchase an inventory was taken and all goods listed upon the receipts were accounted for. Subsequent to the sale of the receipts, the financing of General was handled by the plaintiff, except for some supplier accounts not here in controversy. The record is somewhat confused as to how the defendant was informed of the amount of General's borrowing after plaintiff began to finance General. It does not appear that the purchase price of the goods which plaintiff bought for General or the amount of the contingent liability of plaintiff in guaranteeing payment for merchandise bought by General was included in any report of General's borrowing.

In order to facilitate the operation of the business, specified amounts (in dollar value) of goods under warehouse receipts could be released to General without a signed release from the receipt holder. Before this specified amount was exceeded, the warehouse manager was instructed to secure the written release of such goods. During the time that the Bank was the receipt holder this amount was $500, but upon the purchase of the receipts by the plaintiff, the specified amount was raised to $2,-

000. This was due to the fact that the plaintiff lived in Vicksburg, Mississippi, some forty-five miles from Jackson, and the lower amount was not considered adequate for operational purposes.

After the purchase of the receipts by the plaintiff, the specified limit was not adhered to. Each audit made by the defendant's examiners disclosed unsigned releases in excess of the $2,000 limit, though the warehouse manager had deposit slips representing money deposited to the plaintiff's bank account, which accounted for the disposition of the proceeds from the sale of the goods covered by the unsigned releases. Upon the occasion of each such audit, the plaintiff signed the releases at the request of the examiner and endeavored to absolve the manager of the responsibility for not having them previously signed. Though defendant repeatedly warned its manager not to exceed the specified limit, the entire course of dealings continued to be handled in a seemingly loose manner.

In December 1951, plaintiff became concerned about the operation of the warehouse and engaged the services of an accountant to make an examination of the records. Such examination revealed some apparent shortages. About the first of 1952, the plaintiff stopped signing and the manager stopped preparing any releases. Prior to these developments, negotiations had been in progress looking toward the purchase of General by the plaintiff, but no agreement was reached. In the spring of 1952, plaintiff foreclosed upon the receipts and was the purchaser at the sale. Thereafter, he made demand upon the defendant to deliver the goods evidenced by the receipts. Upon the taking of an inventory, apparent shortages were discovered in several categories. For these shortages and for other alleged damage, plaintiff seeks to be made whole. Each claim will be discussed separately below.

**I**

██ Certain goods were purchased by the plaintiff and shipped to General. These goods were received in June 1951, and placed in the area designated as Lawrence Warehouse, but were not placed under warehouse receipt at that time. This fact was discovered some six months later during the examination made by the plaintiff's accountant, who requested the manager to issue a receipt for the goods. In response to this request a receipt dated December 26, 1951, was issued for the portion of said goods then in the warehouse. This receipt was not satisfactory to the accountant who demanded a receipt for the entire shipment. The receipt previously issued (December 26, 1951) was released, and a receipt covering the entire shipment was issued on December 28, 1951, at which time both parties knew a portion of such goods was missing. The validity of this last receipt is now in question.

The plaintiff had not previously requested a receipt for the goods, and it does not appear that he had requested to have his personal goods placed under receipt. It does not appear that the value of the said goods was included in the "borrowing of General", and the goods were not subject to any warehouse charge. There was no need for a receipt in connection with the financing of the goods, as they were plaintiff's goods and not General's; and the only apparent reason that a receipt would have been desired was to insure plaintiff that the commodities would not fall into unauthorized hands. If such had been the plaintiff's fear at the time the goods were placed in the warehouse, his lax dealings with the affairs of General during the ensuing months appear quite perplexing.

The shortage applicable to the goods evidenced by the receipt (December 28, 1951) covering the entire shipment was $5,998.61. An examination of the two receipts and the list of the shortages establish that the shortage applicable to the merchandise evidenced by the receipt covering the merchandise then in the warehouse (December 26, 1951) was $2,555.12. This merchandise was in the warehouse when the receipt was

requested and issued; it was found wanting upon request for delivery. As to this item, plaintiff is entitled to have and recover of the defendant the amount of $2,555.12 with interest from April 12, 1952.

## II.

The second item of plaintiff's alleged damages relates to the shortage of merchandise under warehouse receipts purchased by the plaintiff from the Bank. There is no question as to the validity of these receipts—the sole question being whether or not there was a shortage, and, if so, the amount thereof.

After the foreclosure and the demand for delivery by the plaintiff, an inventory disclosed an apparent shortage in the amount of $7,703.33 on these old receipts. The defendant attempts to justify its failure to deliver upon demand, claiming prior surrender of the goods upon alleged oral releases. This claim does not prove convincing. Suffice to say, the goods were not to be found; there were no signed releases; there was no record showing delivery to anyone of the goods defendant claims were released upon oral instructions; and where the goods or proceeds went remains as yet a matter of conjecture. The president of General and the warehouse manager state that all deliveries were in accordance with plaintiff's instructions. An exhibit prepared by defendant's accountant indicates that merchandise bearing the same description as that constituting the shortage was sold through General. Conceding this to be a fact, it does not evidence an oral or other release by the plaintiff of the missing goods. Particularly is this true since, as heretofore noted, there were at all times unreceipted goods in the warehouse bearing the same description as receipted goods.

On this claim plaintiff is entitled to have and recover of the defendant the amount of $7,703.33 with interest from April 12, 1952. Cole v. Younger, 58 N.M. 211, 269 P.2d 1096.

## III.

The third item of damages relates to the shortage of merchandise which was purchased by General and for which the plaintiff guaranteed payment. Part of such merchandise was not placed under warehouse receipt upon its delivery to the warehouse. Plaintiff, the warehouse manager, and the president of General, each stated that the understanding among them was that all goods for which the plaintiff guaranteed payment were to ·be placed under receipt. The only knowledge of the defendant relative to this agreement is that which may be imputed from the knowledge of the warehouse manager. The manager was the agent of the defendant, and if the agreement to issue receipts for such goods does not do violence to the contract between defendant and General, then it appears that the knowledge of the manager is to be imputed to defendant.

The question then is, whether the placing under receipt of the goods would have been in accord with the contract between the defendant and General. It should be here noted that the plaintiff had no contract with the defendant except as the receipt holder. If the issuing of the receipt would not have been in accord with the contract between the defendant and General, then the problem arises as to whether the defendant is bound by the manager's acquiescence in such activities between General and the plaintiff which were outside the intention of the parties to the warehousing agreement.

The warehousing agreement provided that the charges were to be based upon the amount of borrowing of General. The first sentence of the quite comprehensive instructions to the manager, upon which both plaintiff and defendant heavily rely, states, "All, or a substantial part of the stored commodities, will be represented by our warehouse receipt, or other evidence of storage, which will be used by the depositor as collateral security for the repayment of borrowed funds." It was upon the

amount of these "borrowed funds" that the charges were computed. It does not appear that the amount of the plaintiff's contingent liability arising out of his guarantee of the purchases of General was included in the amount of General's "borrowing" which was reported to the defendant.

From a financing standpoint, there is perhaps little difference in whether the needed funds are borrowed with which to purchase merchandise, or the purchase of merchandise is made upon the credit or guarantee of the person financing the operations. It further appears that if the amount of the contingent liability arising out of the guarantee of payment had been included in the amount upon which the warehousing charges were based, the defendant would perhaps be liable, as its manager had knowledge of the understanding that all such merchandise was to be placed under receipt. But here the contingent liability of the plaintiff is not included in the amount of the monthly borrowings, and the liability of the defendant is attempted to be increased so as to cover the merchandise shortage without payment for warehousing service thereon. Either by intention or inadvertence, the agreement between General and the plaintiff sought to extend the liability of the defendant to cover the merchandise purchased upon the plaintiff's credit without the payment to defendant of the charges specified in the warehousing agreement.

The problem here is unique in that the plaintiff's claim is not founded upon some act of the agent; but rather is grounded upon the failure of the agent to act, when the omitted act was one which the manager knew should have been performed as between the plaintiff and General, but was without the orbit of the contract between the defendant and General. Regardless of the moral obligation of the agent, it does not appear that the defendant may be held liable for the agent's failure to perform an agreement between the plaintiff and General, the performance of which would not have been in accord with the contract between the defendant and General, under which the merchandise was alleged to have been stored. As to this claim, judgment is for the defendant.

## IV.

■ The fourth item of alleged damages relates to the alleged errors in the collection by the warehouse manager for the goods that were otherwise admittedly properly released. These errors are of two types: errors in the valuation of the goods upon the releases prepared by the manager, and the failure of the manager to calculate and add certain percentages to the declared value of the released commodities. These errors will be discussed separately.

The errors relative to the valuation of the merchandise consist of entering incorrect amounts and some small errors in addition in the preparation of releases. It was the duty of the warehouse manager to prepare the releases and set forth the scheduled valuation of the merchandise thereon. Likewise, it was his duty to have the releases properly executed before the authorized amount of deliveries was exceeded. It appears clear that these errors in valuation and addition were made by him in the discharge of his duties as the defendant's agent, and resulted in loss to the plaintiff. Even though these releases were signed by the plaintiff, he was entitled to rely upon the correctness of the agent's acts within the line and scope of his employment. These errors were in the amount of $702.93, which amount plaintiff is entitled to have and recover.

■ As to the failure of the warehouse manager to add certain percentages to the valuation of the released commodities, the plaintiff and General had agreed that a stated percentage of the declared valuation of each item was to be paid and deposited to the plaintiff's account when merchandise was released. The percentage varied from

70% to 110%, depending upon whether the merchandise was covered by what were known as "old" or "new" receipts. The matter here in dispute relates to the failure to compute the percentages in excess of 100%; that is to say, the agreed 5% or 10% in excess of the declared value was not added to the amount paid to or for the plaintiff. When the agreed percentage was less than 100%, the proper deduction was always computed. The amount here involved is $819.32.

The evidence is to the effect that the plaintiff knew that more or less distress sales were being made. Upon occasions he requested General and the warehouse manager to endeavor to sell the goods to secure needed funds. It is apparent that these were more than regular "pep sales talk". As most aptly noted by counsel, money was a very scarce commodity in the entire operation. It appears evident that the plaintiff knew that some merchandise was being sold at discounts and he accepted the benefits of such sales. The percentages to be applied, agreed upon between the plaintiff and General, could be waived. The plaintiff signed the releases upon which the percentages in excess of 100% had not been applied. He has failed to establish such excess percentage was not waived. On these items he is entitled to recover nothing.

As to the fourth claim, therefore, plaintiff will be allowed judgment in the amount of $702.93 with interest thereon from April 12, 1952.

### V.

■ Plaintiff also claims punitive damages. As heretofore stated, the plaintiff exhibited exceeding laxness in his dealings with the defendant and General. The negligence or dilatory actions of the plaintiff in this regard were a substantial element contributing to the general unsatisfactory conditions that prevailed during this entire operation and culminated in the instant suit. Considering that the present difficulty was, to a considerable extent, caused by the laxness exhibited by the plaintiff, the court is of the opinion that he is not entitled to punitive damages.

Judgment will be entered in accordance herewith.